UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
C.L. and G.W., individually and on behalf of C.L., a child
with a disability,

                                        Plaintiffs,                            **OPINION AND ORDER**

                    - against -                                                No. 11-CV-5242 (CS)

SCARSDALE UNION FREE SCHOOL DISTRICT,

                                        Defendant.
------------------------------------------------------------------------x

<u>Appearances:</u>
Jesse Cole Cutler
Skyer and Associates, L.L.P.
New York, New York
*Counsel for Plaintiffs*

Stephanie Marie Roebuck
Keane & Beane, P.C.
White Plains, New York
*Counsel for Defendant*

<u>Seibel, J.</u>

          Before the Court are Plaintiffs' Motion for Summary Judgment, (Doc. 16), and

Defendant's Cross-Motion for Summary Judgment, (Doc. 10).  Plaintiffs C.L. and G.W. bring

this action, individually and on behalf of their child C.L. ("CL"), pursuant to the Individuals with

Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. §§ 1401 *et seq.*;[1] Section 504 of

the Rehabilitation Act of 1973, 29 U.S.C. § 794; and Article 89 of the New York State Education

---

[1] The Individuals with Disabilities Education Act ("IDEA") was amended in 2004 by the IDEIA.  All references to and cases cited herein discussing the IDEA remain authoritative.

Law, against Defendant Scarsdale Union Free School District (the "District"). Plaintiffs seek review of an administrative decision by a State Review Officer ("SRO") at the New York State Education Department affirming in relevant part the decision of an Impartial Hearing Officer ("IHO"). The IHO found that (1) the District denied CL a Free and Appropriate Public Education ("FAPE") when it decided he was ineligible for classification under the IDEA, (2) the private school – Eagle Hill School ("Eagle Hill") in Greenwich, Connecticut – at which CL's parents placed him for the 2009-2010 school year was not an appropriate placement for CL, and (3) the parents failed to cooperate in good faith in obtaining educational services for CL by not referring CL to the Greenwich School District – rather than the Scarsdale School District – for evaluation. (IHO Decision 22-24.)[2] The SRO agreed with the IHO's conclusions on the first two points, finding that the District failed to develop an Individualized Education Program ("IEP") for CL and thereby denied him a FAPE and that Plaintiffs failed to present sufficient evidence to demonstrate that Eagle Hill was an appropriate placement, and did not reach the third point. (SRO Decision 9, 12-15.)[3]

Neither party contests the first finding – that the District denied CL a FAPE, (*see* D's Mem. 4)[4] – so I need not address it. Plaintiffs seek an order reversing the SRO's decision on the second point and awarding Plaintiffs tuition reimbursement for the year 2009-2010. (Compl. ¶

---

[2] "IHO Decision" refers to the decision of Impartial Hearing Officer George Kandilakis, December 14, 2010. This document forms part of the administrative record that was filed under seal with this Court on February 28, 2012. (*See* Doc. 9.) The exhibits cited herein form part of the administrative record presented to the SRO and filed under seal. They are referred to here according to the name of the party that apparently submitted them – "Joint Ex.," "Parent Ex.," and "District Ex." The complete list of exhibits is part of the record that was submitted to the SRO on January 21, 2011.

[3] "SRO Decision" refers to the Decision of SRO Justyn P. Bates, April 1, 2011. (Doc. 1, Ex. 1.)

[4] "D's Mem." refers to Memorandum of Law in Support of Defendant's Cross Motion for Summary Judgment. (Doc. 12.)

39; Ps' Mem. 22.)[5]  Plaintiffs also request "compensatory education and monetary relief" for

their claim under Section 504 of the Rehabilitation Act.  (Compl. ¶ 51.)  Defendant seeks an

order affirming the SRO's decision and dismissing Plaintiffs' Complaint.  (D's Mem. 2.)  For the

reasons set forth below, Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's

Cross-Motion for Summary Judgment is GRANTED.

## I.  <u>Background</u>

The history of this case is set forth at length in an Opinion and Order I issued in a related

case in which Plaintiffs challenged an SRO's denial of tuition reimbursement for their unilateral

placement of CL at Eagle Hill for the 2008-2009 school year.  *See C.L. v. Scarsdale Union Free*

*Sch. Dist.* ("*CL I*"), No. 10-CV-4315, 2012 WL 983371 (S.D.N.Y. Mar. 22, 2012).[6]  Familiarity

with the facts set forth in that decision is assumed, and only new facts relating to the denial of

tuition reimbursement for the 2009-2010 school year are set forth here.

The following facts are undisputed unless otherwise noted.  CL attended Greenacres

Elementary School ("Greenacres") in Scarsdale, New York from Kindergarten (2004-2005)

through third grade (2007-2008).  (D's Reply 56.1 ¶¶ 3, 5.)[7]  During that time, the District

provided CL with an accommodation plan pursuant to Section 504 of the Rehabilitation Act (the

"504 Plan") but did not provide CL with an IEP pursuant to the IDEA.  (*Id.* ¶¶ 5-6.)  Plaintiffs

maintain that because of the District's refusal to provide CL with an IEP and Plaintiffs' view that

the 504 Plan was insufficient, Plaintiffs unilaterally enrolled CL at Eagle Hill for the 2008-2009

school year.  (*Id.* ¶ 6.)

---

[5] "Compl." refers to Plaintiffs' Complaint, filed July 28, 2011.  (Doc. 1.)  "Ps' Mem." refers to Memorandum of Law in Support of Plaintiff's [*sic*] Motion for Summary Judgment.  (Doc. 17.)

[6] In *CL I*, I affirmed the SRO's denial of tuition reimbursement for the 2008-2009 placement at Eagle Hill.

[7] "D's Reply 56.1" refers to Defendant's Reply to Plaintiffs' Rule 56.1 Statement of Undisputed Material Facts. (Doc. 18.)

A.     Request for an IEP

On July 22, 2009, the parents sent a letter to the District requesting a meeting of the Committee on Special Education ("CSE") for the purposes of developing an IEP for CL for the 2009-2010 academic year. (*Id.* ¶ 8.)  By letter dated August 20, 2009, the District notified the parents that the CSE would convene on September 3, 2009 to discuss CL's educational program. (Ps' Reply 56.1 ¶ 12;[8] Joint Ex. 1-C.)  On August 24, 2009, the parents informed the District of their intention to keep CL at Eagle Hill for the 2009-2010 school year based on the District's denial of a FAPE. (D's Reply 56.1 ¶ 10; Joint Ex. 1-D.)

At the September 3 meeting, the CSE reviewed the results of CL's educational testing and a letter from CL's advisor at Eagle Hill and found that CL did not meet the criteria for classification under the IDEA. (Ps' Reply 56.1 ¶ 14.)  At the meeting, the CSE informed Plaintiff G.W. that if the parents wanted CL to be evaluated, they should speak with Eagle Hill about a referral to the Greenwich Public Schools for that purpose or obtain an evaluation privately, and submit the results to the District for consideration when they planned to enroll CL in a District school. (Joint Ex. 1-E.)  In other words, the District expressed its view that in the situation where the child was not enrolled in the public school, the "district of location" – the district where Eagle Hill is located (Greenwich) – was responsible for evaluating CL rather than the "district of residence" (Scarsdale). (*Id.*)  Dr. Mendelson, the Director of Special Education for the District, also informed the parents that "new evaluations would assist the CSE in determining [CL's] needs." (D's Reply 56.1 ¶ 13.)  By letter dated September 10, 2009, the District notified the parents that "[a]fter careful consideration and review of all evaluative

---

[8] "Ps' Reply 56.1" refers to Petitioners' Reply to Defendant's Statement of Undisputed Facts Pursuant to Local Rule 56.1. (Doc. 20.)

materials and school reports, the [CSE] has recommended that [CL] does not meet the criteria to be classified as a student with a disability and does not require special education at this time." (Joint Ex. 1-E.)

    B.    <u>Procedural History</u>

       On June 4, 2010, Plaintiffs filed an Impartial Hearing Request seeking reimbursement for their unilateral placement of CL at Eagle Hill during the 2009-2010 school year. (D's Reply 56.1 ¶ 18.) On July 9, 2010, the District filed a Motion to Dismiss the Impartial Hearing Request, reiterating that the Greenwich School District was responsible for evaluating CL. (*Id.* ¶ 21.) On October 18-19, 2010, IHO George Kandilakis heard testimony in connection with the motion. (*Id.* ¶ 24.) On December 14, 2010, the IHO dismissed the District's Motion, found that the District had failed to provide CL with a FAPE, and denied Plaintiffs' request for tuition reimbursement. (IHO Decision 22-24.) On January 24, 2011, Plaintiffs appealed the IHO's decision to the New York State Education Department's Office of State Review. (D's Reply 56.1 ¶ 34.) On April 1, 2011, the SRO affirmed the IHO's decision in relevant part. (*Id.* ¶ 37.) Plaintiffs appealed that decision by filing their Complaint with this Court. (Doc. 1.)

    C.    <u>IHO Decision</u>

       As noted earlier, because neither party contests the administrative decision concerning the District's denial of a FAPE, I focus solely on the decisions by the IHO and SRO to deny Plaintiffs tuition reimbursement for the 2009-2010 school year. With respect to that issue, the IHO focused his attention on the progress reports from Eagle Hill dated December 2008 and June 2009 and the report from a private psychologist, Dr. Salsberg, from August 2010. (IHO Decision 22-23.) The IHO noted that CL scored well on tests, but that he continued to need specialized academic assistance. (*Id.* at 22-23.) Nonetheless, CL's deficits – particularly in

math, language arts, and study skill – were not severe enough to materially affect his ability to function in a regular classroom with accommodations and monitoring of his behavioral and emotional needs. (*Id.* at 23.) The IHO thus concluded that CL could "benefit from attending mainstream classes with modifications and accommodations," and "[g]iven his academic and social progress, there is no need for . . . specialized instruction throughout his day . . . ." (*Id.*)

        D.     <u>SRO Decision</u>

        The SRO likewise found that Plaintiffs had not fulfilled their burden of demonstrating that Eagle Hill was an appropriate placement because, among other things, they "failed to establish that Eagle Hill provided [CL] with education instruction specially designed to meet [his] unique needs . . . ." (SRO Decision 11.) He noted that Plaintiffs failed to present sufficient evidence regarding CL's academic functioning, his specific program at Eagle Hill, or how that program was specially designed to meet CL's unique needs. (*Id.*) He found the testimony of Ms. Griffin, former director of admissions at Eagle Hill, too general and the testimony of Dr. Salsberg limited because he lacked personal knowledge about CL's program and functioning during the year in question. (*Id.* at 11-12.)

        The SRO also found that neither CL's parent's testimony nor the Eagle Hill progress reports were sufficient to establish that Eagle Hill was appropriate because they failed to demonstrate why the modifications and supports CL received at Eagle Hill were specially designed to meet his unique needs, rather than being educational amenities that all parents would prefer for their children. (*Id.* at 12-13.) Finally, the SRO noted that the IHO properly considered the restrictiveness of Eagle Hill in making his determination, and that restrictiveness considerations weighed against a finding of appropriateness in this case. (*Id.* at 13-14.)

## II.   **Applicable Legal Standards**

### A.   **IDEIA**

#### 1.   **Summary Judgment Standard**

Motions for summary judgment customarily resolve IDEA actions in federal court. *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003). Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion. *Id.* Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted). In reviewing an action pursuant to 20 U.S.C. § 1415(i) of the IDEA, the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380-81 (2d Cir. 2003).

In deciding the motion, the court undertakes what "has been characterized as modified *de novo* review." *C.B. ex rel. W.B. v. N.Y.C. Dep't of Educ.*, No. 02-CV-4620, 2005 WL 1388964, at *12 (E.D.N.Y. June 10, 2005) (internal quotation marks omitted). The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the

specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 244. In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO." *M.H.*, 685 F.3d at 244. Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. In order to avoid "impermissibl[y] meddling in state educational methodology," the court should look for objective evidence – such as grades and test results – to determine whether the child is likely to progress or regress under the proposed plan. *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1121 (2d Cir. 1997).

2.     Unilateral Placement in Private School

"If a state receiving IDEA funding fails to give a disabled child a FAPE . . ., the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *Bd. of Educ. v. O'Shea*, 353 F. Supp. 2d 449, 454 (S.D.N.Y. 2005) (internal quotation marks omitted). "In determining whether parents are entitled to reimbursement, the Supreme Court has established a two pronged test: (1) was the IEP proposed by the school district inappropriate; (2) was the private placement appropriate to the child's needs. Moreover, because the authority to grant reimbursement is discretionary, equitable

considerations relating to the reasonableness of the action taken by the parents are relevant in

fashioning relief." *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363-64 (2d Cir. 2006) (alteration,

citations, and internal quotation marks omitted).  Because neither party contests the SRO's

decision that the District denied CL a FAPE, only the second prong is at issue in this case.

Parents bear the burden of demonstrating that a private placement is appropriate, *see id.*

at 364; N.Y. Educ. Law § 4404(1)(c), even if the Defendant's program was inappropriate, *see*

*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007).  The parents'

placement must be "reasonably calculated to enable the child to receive educational benefits,"

such that it is "likely to produce progress, not regression." *Frank G.*, 459 F.3d at 364 (internal

quotation marks omitted).  "Grades, test scores, and regular advancement may constitute

evidence that a child is receiving educational benefit, but courts assessing the propriety of a

unilateral placement consider the totality of the circumstances in determining whether that

placement reasonably serves a child's individual needs." *Id.* at 364-65.  Therefore, while "a

child's progress is relevant to the court's review, such progress does not itself demonstrate that a

private placement was appropriate." *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514,

523 (S.D.N.Y. 2011) (internal quotation marks omitted).  As such, "even where there is evidence

of success in the private placement, courts should not disturb a state's denial of IDEA

reimbursement where the chief benefits of the chosen school are the kind of advantages that

might be preferred by parents of any child, disabled or not." *M.H.*, 685 F.3d at 246 (alterations

and internal quotation marks omitted).

But "the test for the parents' private placement is that it is appropriate, and not that it is

perfect," *Warren G. ex rel. Tom G. v. Cumberland Cnty. Sch. Dist.*, 190 F.3d 80, 84 (3d Cir.

1999), and "parents need not show that a private placement furnishes every special service

9

necessary to maximize their child's potential." *Frank G.*, 459 F.3d at 365. Rather, parents must show that the "placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *Id.* (internal quotation marks omitted).

Finally, the IDEA exhibits a "strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *Grim*, 346 F.3d at 379 (alteration in original) (quoting 20 U.S.C. § 1412(a)(5)). While "parents may not be subject to the same mainstreaming requirements as a school board," *Frank G.*, 459 F.3d at 364 (internal quotation marks omitted), the "IDEA's requirement that an appropriate education be in the mainstream to the extent possible . . . may be considered by the hearing officer in determining whether the [parents' unilateral] placement was appropriate." *Weaver*, 812 F. Supp. 2d at 524 (internal quotation marks omitted); *see Muller ex rel. Muller v. Comm. on Special Educ.*, 145 F.3d 95, 105 (2d Cir. 1998) ("[T]he presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students.") (internal quotation marks omitted); *Adrianne D. v. Lakeland Cent. Sch. Dist.*, 686 F. Supp. 2d 361, 367 (S.D.N.Y. 2010) ("The level of restrictiveness may be considered in determining whether tuition reimbursement should be ordered."); *see also Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 549 n.10 (S.D.N.Y. 2010) (given role that mainstreaming may play in assessing appropriateness of private placement, Second Circuit's two-part test for determining whether district's IEP provides least restrictive environment may also be useful in determining appropriateness of parental placement. The test asks: "(1) 'whether a student can be satisfactorily educated in the regular classroom with the benefit of supplemental aids and services;' and (2) if the school district was justified in removing the

student from the mainstream classes, 'whether the school has included the child in school

programs with nondisabled children to the maximum extent appropriate.'") (quoting *P. v.*

*Newington Bd. of Educ.*, 546 F.3d 111, 121 (2d Cir. 2008)).

    B.    <u>Rehabilitation Act of 1973</u>

        1.    <u>Summary Judgment Standard</u>

       Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. The movant

bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if

satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every

element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.*

*Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

"Though caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994) (citation omitted); see *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("[S]ummary judgment may be appropriate even in the fact-intensive context of discrimination cases. . . . [T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.") (alteration and internal quotation marks omitted).

2.   <u>Section 504</u>

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified

individual with a disability in the United States . . . shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

The scope of protection under the Rehabilitation Act differs from that under the IDEA. "The

Rehabilitation Act provides relief from discrimination, whereas [the] IDEA provides relief from

inappropriate educational placement decisions, regardless of discrimination." *"BD" v.*

*DeBuono*, 130 F. Supp. 2d 401, 438 (S.D.N.Y. 2000). "[T]o prove a violation of the

Rehabilitation Act, a plaintiff must show that:  (1) he is an individual with a disability; (2) he is

otherwise qualified to participate in a particular program; (3) he was denied that participation

based upon his disability; and (4) the program receives federal funds." *Id.* (citing *D'Amico v.*

*City of N.Y.*, 132 F.3d 145 (2d Cir. 1998)).  A plaintiff may assert a Section 504 claim in

conjunction with an IDEA claim on the theory that he has been "denied access to a free

appropriate education, as compared to the free appropriate education non-disabled students

receive"; in so doing, however, the plaintiff must show that "defendants acted with bad faith or

gross misjudgment in the administration of disability services." *S.W. v. Warren*, 528 F. Supp. 2d

282, 290 (S.D.N.Y. 2007).

> That a court may . . . come to the conclusion that an incorrect evaluation has been
> made, and that a different placement must be required [under IDEA], is not
> necessarily the same thing as holding that a [disabled] child has been
> discriminated against solely by reason of his or her [disability].   Therefore,
> something more than a mere violation of the IDEA is necessary in order to show a
> violation of Section 504 in the context of educating children with disabilities, *i.e.*,
> a plaintiff must demonstrate that a school district acted with bad faith or gross
> misjudgment.

13

*Zahran v. N.Y. Dep't of Educ.*, 306 F. Supp. 2d 204, 213 (N.D.N.Y. 2004) (alterations in original) (internal quotation marks omitted).

**III.  Discussion**

    A.  IDEIA

       I have reviewed the administrative record thoroughly, and based on the evidence – all of which was also presented to the SRO, *see M.H.*, 685 F.3d at 244 ("[T]he district court should afford more deference [to the SRO's decision] when its review is based entirely on the same evidence as that before the SRO . . . .") – conclude that the SRO's decision is supported by a preponderance of the evidence. *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *M.H.*, 685 F.3d at 244.

       First, the SRO properly gave limited credence to Griffin's testimony, because while her testimony – like the print-outs from the Eagle Hill website, (*see* Parent Ex. R) – explains the nature of the Eagle Hill program and curriculum generally, it sheds little light, if any, on how this program pertained to CL and met CL's specific needs during the year in question, (*see* SRO Decision 11). In fact, Griffin was not even employed at Eagle Hill during the 2009-2010 school year, and her previous familiarity with CL was demonstrably limited. (*See* Tr. 158, 193, 201-02.)[9]

       Second, the SRO understandably discounted Salsberg's testimony. (*See* SRO Decision 12.) Salsberg testified that Eagle Hill catered to CL's needs in a number of respects, through its small class size, (Tr. 113-14), tailored curriculum, (*id.* at 114, 118), method of disseminating information, (*id.* at 115, 117-18), and liberal access to teachers for the students, (*id.* at 115). The SRO found this testimony not sufficiently probative, however, because it was not based on Salsberg's personal knowledge of CL's program or behavior during the 2009-2010 school year.

---

[9] "Tr." refers to the transcript of the proceedings before the IHO on October 18-19, 2010.

(SRO Decision 12.)  On one hand, I would give the testimony more weight than did the SRO, as I imagine Salsberg's expertise lends itself well to analyzing data – particularly data from the relevant time period – and drawing conclusions from it, even if he did not make the initial observations personally.[10]  I also give significant weight to his testimony regarding how Eagle Hill teachers address CL's executive functioning issues.  (*See* Tr. 117-18.)  On the other hand, many of the aspects of Eagle Hill that Salsberg highlighted – *e.g.*, small class size and enhanced access to teachers – "are the kind of advantages that might be preferred by parents of any child, disabled or not."  *M.H.*, 685 F.3d at 246 (alterations and internal quotation marks omitted).

Moreover, Salsberg's testimony does not show that CL would not have progressed at a District school or a private school not exclusively for students with learning disabilities (as Eagle Hill is).  He testified that the "pull-out model" – pulling a child out of class – is not well-suited to treating executive functioning difficulties like CL's and would likely cause CL anxiety.  (Tr. 120-21.)  He also stated that the "integrated" or "co-teaching" model offered by the District[11] would not necessarily target CL's specific difficulties.  (*Id.* at 122-23.)  At the same time, however, Salsberg admitted that he had never observed CL in a general education environment, (*see id.* at 137), and it is not clear why having an aide in a mainstream classroom, for example, could not have helped address CL's executive functioning and other issues.  Thus, his opinions on how CL would fare in a mainstream classroom with special accommodations should be given diminished weight, or at least do not show that CL could not have made adequate progress in a District school or a less restrictive private school.  Accordingly, while I find Salsberg's

---

[10] At the same time, however, Salsberg's testimony casts doubt on the extent to which some of the test results he analyzed may properly be used to assess progress. (*See* Tr. 134-35, 140-41, 150-51; Parent Ex. H, at 3 (certain test results should be viewed with caution).)

[11] On September 11, 2009, the District offered to place CL in a class at its Fox Meadow elementary school ("Fox Meadow") that is co-taught by a regular education teacher and a special education teacher and provides accommodations required by CL's 504 Plan. (*See* Parent Ex. G ¶ 21.)

testimony more probative of the issue of appropriateness than did the SRO, I agree with the SRO

that on its own, it is insufficient to sustain Plaintiffs' burden of demonstrating that the services at

Eagle Hill were tailored to meet CL's unique needs.

Third, the SRO found CL's parent's testimony insufficient to establish that Eagle Hill

was an appropriate placement because, for example, the supports described by CL's parent were

the type of "'educational and environmental advantages and amenities'" that would be preferred

by any parent. (SRO Decision 13 (quoting *Gagliardo*, 489 F.3d at 115).) He also noted that the

parent testified that CL received only limited counseling at Eagle Hill for his emotional issues,

and instead received outside counseling and medication during the 2009-2010 school year,

suggesting that Eagle Hill was not tailored to CL's special needs with regard to his anxiety.

(SRO Decision 12; *see* Tr. 254.) I agree with the SRO and also note that to the extent CL's

parent testified about the degree to which CL benefitted from his time at Eagle Hill, (*see, e.g.*,

Tr. 245), this testimony is not highly persuasive given courts' preference for "objective"

evidence at this stage of review. *See M.S. ex rel. S.S. v. Bd. of Educ.*, 231 F.3d 96, 105 (2d Cir.

2000), *abrogated on other grounds*, *Schaffer v. Weast*, 546 U.S. 49 (2005); *Mrs. B.*, 103 F.3d at

1120-21.

Fourth, for similar reasons, the SRO found the progress reports unpersuasive. While the

reports demonstrate that Eagle Hill provided a number of desirable classroom modifications and

supports for its students, they do not show how these supports were tailored to CL's unique

needs during 2009-2010 and not simply academic amenities that would be preferred by any

parents. (SRO Decision 13.) For example, the SRO stated that the progress reports noted CL's

need for direct instruction in limited areas, but did not explain "the appropriateness of providing

direct instruction in the areas designated, given the student's age and grade; what the direct

16

instruction consisted of; who provided the direct instruction; or the frequency or the duration of the direct instruction," (SRO Decision 13), suggesting that the parents had not met their burden of showing that Eagle Hill was sufficiently addressing CL's weakest areas in a way tailored to his individual needs.  In any event, as the SRO also noted, progress alone is insufficient to carry the Plaintiffs' burden of demonstrating the appropriateness of Eagle Hill.  (*See* SRO Decision 12.)  *See Weaver*, 812 F. Supp. 2d at 523 (progress alone does not demonstrate that private placement was appropriate).  I agree with the SRO's analysis of the progress reports.  The reports discuss at length CL's behavior, personality, and strengths and weaknesses, but they do not indicate how Eagle Hill's services were tailored to CL's needs.  Similarly, the classroom evaluations included with the reports discuss the nature and goals of the classes generally but provide no information on how or why the structure of the class benefitted CL.  (*See, e.g.*, Parent Ex. N.)  Thus, I find the SRO's findings with regard to the progress reports well-reasoned and worthy of deference.

Finally, the SRO properly noted that considering the restrictiveness of a placement is appropriate.  (*See* SRO Decision 13-14.)  *See Weaver*, 812 F. Supp. 2d at 524.  In considering restrictiveness, the SRO reviewed CL's test scores from 2008-2009 and 2009-2010 and stated that CL's "academic skills have remained at or above grade level." (SRO Decision 14.)  One could interpret these positive test scores[12] in one of two ways.  They could either signify progress over time due to CL's placement at Eagle Hill – progress that arguably would not have been made had CL continued at a District school.  Alternatively, the fact that some of CL's scores were above average and/or above grade level in both of the years that he attended Eagle Hill,

---

[12] I will assume for the purposes of these Motions that overall, CL made progress at Eagle Hill during the 2009-2010 school year, although not every test score indicates as much.  (*See, e.g.*, Parent Ex. N, at 22 (comparison of Gray Oral Reading Test scores from Spring 2009 and Spring 2010 appears to show that CL's scores declined in two of the four subtests, and his percentile ranking declined for all four subtests).)

(*see, e.g.*, Parent Ex. L, at 4-6; *id.* Ex. N, at 22), could also signify that his academic difficulties were not sufficiently severe to warrant a placement like Eagle Hill, (*see* D's Mem. 10). The SRO took the latter view and found, based on CL's test scores and the fact that the administrative ruling in *CL I* found Eagle Hill to be too restrictive, that restrictiveness considerations "weigh more heavily against a finding that [CL] required a full-time special education program[] such as Eagle Hill . . . ." (SRO Decision 14.)

I find the SRO's analysis of the test scores reasonable and worthy of deference. But even if I were to read the test scores simply as evidence that Eagle Hill was beneficial for CL, the test scores, evaluations, and reports still do not shed light on whether CL also could have progressed in a more mainstream environment – either at Greenacres with special accommodations, or at Fox Meadow in a collaborative co-teaching program, or at a different private placement. The distinction is important, because presumably any student – disabled or not – would make progress in a small, nurturing, academic environment with a tailored curriculum. Thus, in light of the law's deliberate preference for mainstreaming students to the maximum extent possible, *see In re S.H. v. N.Y.C. Dep't of Educ.*, No. 09-CV-6072, 2011 WL 609885, at \*9 (S.D.N.Y. Feb. 18, 2011), I agree that the progress reports – viewed alone or in conjunction with the other evidence in the record – are not sufficient to sustain Plaintiffs' burden of demonstrating that Eagle Hill was an appropriate placement.

In sum, viewing the administrative record as a whole, I find that the SRO's opinion is supported by a preponderance of the evidence and deserves deference from this Court. His review of the record was thorough – he appears to have considered all of the evidence submitted by the parties – and he set forth his decision in a well-reasoned, detailed opinion. While I have no doubt that Eagle Hill was a positive environment for CL and that CL benefitted from its

18

services, progress alone is not enough to sustain Plaintiffs' burden, *see Weaver*, 812 F. Supp. 2d
at 523; *Stevens ex rel. E.L. v. N.Y.C. Dep't of Educ.*, No. 09-CV-5327, 2010 WL 1005165, at *9
(S.D.N.Y. Mar. 18, 2010), and Plaintiffs have not put forth additional evidence showing that
Eagle Hill provided services tailored to CL's unique needs, *see Frank G.*, 459 F.3d at 365, or that
he required total removal from a mainstream environment. Finally, because I find that tuition
reimbursement is not appropriate for the 2009-2010 school year, I need not address whether
equitable considerations would warrant reimbursement.

      While I sympathize with Plaintiffs' desire to procure the best possible education for CL
and with their frustration with the District's failure to provide CL with adequate educational
services, it is not the role of the District Court to award tuition reimbursement where it is not
shown that a particular placement – even if highly beneficial for the child – is suited to meet a
child's unique needs or that the child required removal from a mainstream classroom. I also
understand Plaintiffs' argument that finding that a school district failed to offer a child a FAPE
but refusing to award tuition reimbursement provides a "remedy without teeth." (Ps' Mem. 18.)
But awarding tuition reimbursement for a unilateral placement every time a school district has
failed to provide educational services is simply not the law. *See Gagliardo*, 489 F.3d at 111
(parents who believe public school has denied their child a FAPE may enroll child in private
school "at their own financial risk"). Were it the law, there would be a one-part test (was the
child denied a FAPE?), rather than a two-part test (was the child denied a FAPE and is the
private placement appropriate?), for parental reimbursement. *See id.* at 111-12. The parents'
options here were not simply Eagle Hill or the public school. Another private placement might
have met the second prong of the test. I do not mean to suggest by any means that the parents

have done their child a disservice by enrolling him at Eagle Hill, but simply point out that the remedy is not "without teeth" if the placement meets the applicable legal standards.

For the reasons stated above, Defendant's Cross-Motion for Summary Judgment is granted with regard to Plaintiff's IDEIA claim and Plaintiffs' Motion for Summary Judgment is denied with regard to that claim.

B.    Rehabilitation Act

Plaintiffs' Complaint alleges a violation of Section 504 of the Rehabilitation Act. Neither party specifically mentions this claim in its motion papers, but given that Defendant seeks dismissal of the entire Complaint, (*see* D's Mem. 1), I presume it seeks summary judgment with regard to this claim and will address it.

I first note that all of the paragraphs in the Complaint describing this claim except for one are taken verbatim from Plaintiffs' prior complaint seeking tuition reimbursement for the 2008-2009 school year. (*Compare* Compl. ¶¶ 45-48, 50-51, *with CL I*, Doc. 1, ¶¶ 34-37, 39-40.) To the extent Plaintiffs wish to bring another Section 504 claim based on the same facts in *CL I*, that claim is denied for the reasons set forth in that opinion, *see CL I*, 2012 WL 983371, at *15-16, and on the grounds of collateral estoppel and *res judicata*.

To the extent Plaintiffs seek to assert a new claim under Section 504 based on the new facts at issue here, that claim also fails, because Plaintiffs have failed to put forth sufficient evidence to raise a question of fact with regard to whether the District acted with bad faith or gross misjudgment. Plaintiffs allege that "Defendant's Director of Special Education refused to provide a requested evaluation for C.L. despite [a] written request for the same and notification to the Petitioners that the District required such additional evaluation so as to determine C.L.'s special education needs." (Compl. ¶ 49.) Yet Plaintiff has failed to present any facts indicating

20

that the District refused the requested evaluation in bad faith. To the contrary, the overwhelming evidence in the record indicates that the District believed that the "district of location" – Greenwich School District – bore the responsibility for evaluating CL and that it had no legal duty to evaluate him or provide him with an IEP before Plaintiffs expressed their intent to enroll CL in a District school. (*See, e.g.*, Parent Ex. C; *id.* Ex. G ¶ 27; District Ex. 1.) Whether or not the District was correct about its legal obligations is not controlling. Rather, the relevant question is whether there is any evidence raising a genuine issue of material fact regarding whether it acted with bad faith or gross misjudgment, and I find that there is not. Indeed, the IHO apparently agreed with the District's interpretation of the applicable regulations, (*see* IHO Decision 24), suggesting at the least that reasonable minds could differ on the subject in good faith. Accordingly, Defendant's Motion is granted as to this claim.

## IV.   Conclusion

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is DENIED, and Defendant's Cross-Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 10, 16), enter judgment for the Defendant, and close the case.

**SO ORDERED.**

Dated: December 21, 2012
White Plains, New York

_Cathy Seibel_
CATHY SEIBEL, U.S.D.J.